*In re* ESTATE OF JOSEPHINE TRAHEY, Incompetent.—(MARGARET FITZ-PATRICK, Petitioner-Appellant, *v.* JAMES C. McLELLAN, Individually and as Conservator of the Estate of JOSEPHINE TRAHEY, Incompetent, *et al.*, Respondents-Appellees.)

(No. 59596;

First District (3rd Division)—January 23, 1975.

John G. Spatuzza, Gerald M. Chapman, and Alan M. Polikoff, all of Chicago, for appellant.

Paul R. Hoffman, of Chicago, for appellees.

Mr. JUSTICE DEMPSEY delivered the opinion of the court:

This action was brought by Margaret Fitzpatrick to recover funds which had been held in a joint account in her name and that of the deceased, Josephine Trahey. Her petition was denied and she has appealed.

On July 7, 1960, Josephine Trahey opened a joint account with the right of survivorship at the Drover's Trust and Savings Bank with her brother John Conway and her nephew James McLellan. The account continued in their names until December 1970 and grew from the initial deposit of $5,906.99 to $32,519.03. In the intervening years Mrs. Trahey, a widow, lived with her younger brother, John. Her health gradually deteriorated, and cataracts developed in her eyes. In July 1970 an operation was performed on one eye. It was only partially successful, and her vision remained impaired.

On December 7, 1970, when she was in her 89th year of life, she accompanied Margaret Fitzpatrick, who was married to a nephew of Mrs. Trahey's deceased husband, to the Drover's bank and transferred the funds from the Trahey-Conway-McLellan account to a new joint account in her name and that of Mrs. Fitzpatrick. Mrs. Fitzpatrick took possession of the passbook and $150 was withdrawn from the account that day.

In January 1971 Mrs. Trahey broke her hip and was hospitalized. She died on June 6. While she was in the hospital, her brother petitioned the probate court to appoint a conservator for her and her estate and nominated James McLellan. The petition was supported by a doctor's affidavit which stated that she was confused, disoriented and incapable of managing her affairs. She was adjudicated an incompetent on February 24, and McLellan was appointed conservator. On the same day, a citation was directed to Mrs. Fitzpatrick for information about and discovery of personal property belonging to Mrs. Trahey's estate. She was commanded to appear before the judge of the probate court on March 18 under threat of being punished for contempt. A few days after the citation was served, Mrs. Fitzpatrick and her husband called upon John Conway and turned the passbook over to him.

On March 4, McLellan filed a petition which alleged that Mrs. Trahey was incompetent when her funds were transferred from the first joint account to the second, and that she was induced by Mrs. Fitzpatrick to make the change. The petition stated that Mrs. Fitzpatrick had given the passbook to Conway; it requested that the balance in the second account be redeposited in the names of Mrs. Trahey, John Conway and James McLellan. The petition was granted and the funds were redeposited.

On March 18, 1971, the return date of the citation, the conservator's

attorney and the Fitzpatricks appeared in court, but at different times. Their versions of what took place were testified to at the hearing on the plaintiff's petition. The attorney said that when the case was called he asked that the citation be dismissed because its purpose had been accomplished, and that it was dismissed. Mrs. Fitzpatrick testified that when her name was called she approached the bench and the judge read the citation. She informed him that she had brought the passbook to Conway, and the judge concluded the matter by saying that was probably why the other side did not show up.

There were no further developments in the case until 11 months later when Mrs. Fitzpatrick was granted leave to enter her appearance. Four weeks after this—on March 13, 1972—she filed a petition which asserted that the order of March 4, 1971, improperly directed transfer of the funds from her account with Mrs. Trahey and she asked that the order be vacated. The petition alleged that the order was entered without prior notice to her; that she was frightened by the citation summons; that she was confused and without benefit of counsel when she surrendered the passbook; that she did not intend to relinquish her interest in the account, and that she had expected that the dispute between her and the conservator would be resolved on the return date of the citation. She took exception to the conservator's final account and asked for a hearing as provided for by the Probate Act (Ill. Rev. Stat. 1971, ch. 3, par. 187a) to determine her right to the money on deposit in the joint bank account on the day the order was entered.

The conservator's motion to dismiss the petition was denied, and a hearing was held. At its conclusion the trial court found that Mrs. Trahey was incompetent at the time she opened the account with Mrs. Fitzpatrick. Mrs. Fitzpatrick acknowledges that the pivotal issue in her appeal is the court's finding of incompetency, but she nevertheless argues that the court erred in not first passing on the validity of the order of March 4, 1971. She contends that this order (a) divested her of her property without a hearing and thus deprived her of due process of law, and (b) that there was no evidence that she knowingly waived her claim to the joint tenancy account.

The two contentions are intertwined. The argument of invalidity is based upon the conceded fact that no notice of the March 4 petition or hearing was served upon her. The respondents reply that notice was not necessary because she had relinquished all interest in the account before the March 4, 1971, hearing.

Upon being served with the citation, Mrs. Fitzpatrick called the attorney whose name appeared on the citation. He testified that she asked him what the citation was all about and whether she should retain a

lawyer. He told her she should. A day later he returned a telephone call from her husband who said his wife claimed no interest in the account and asked to whom the passbook should be given. The Fitzpatricks disputed this testimony. Mrs. Fitzpatrick said she did not discuss the citation with the attorney. Mr. Fitzpatrick testified that the attorney instructed him to turn over the passbook.

John Conway testified that when the Fitzpatricks surrendered the passbook Mr. Fitzpatrick said, "We didn't want any part of this anyhow, we have no interest in it." Mrs. Fitzpatrick testified, "I gave him back his bank book," but she added that nothing was said concerning her interest in the account.

■■ The principle of "waiver" will be recognized whenever a party intentionally relinquishes a known right or acts in such a manner to warrant an inference of such relinquishment. (*National Bank v. Newberg* (1972), 7 Ill.App.3d 859, 289 N.E.2d 197; *A-1 Cleaners & Dyers v. American Mutual Liability Insurance Co.* (1940), 307 Ill.App.64, 30 N.E.2d 87.) From the above testimony, and the additional facts that the passbook was quickly surrendered in the face of a scheduled court proceeding and that Mrs. Fitzpatrick neither consulted nor engaged a lawyer to defend her right, if she thought she had one, in a $32,500 account, the trial court could have concluded that she voluntarily waived her interest in the account and that she had not demonstrated why a subsequent hearing, held without notice to her, should be declared void.

But apart from this, she is in no position to protest. She made no motion to vacate the order of March 4 and did not appeal it. It was a final order. It removed Mrs. Trahey's money from her account with Mrs. Fitzpatrick and redeposited it in her account with Conway and McLellan. Mrs. Fitzpatrick attempts to circumvent her failure to appeal by asserting that her petition of March 13, 1972, filed 1 year after the order of which she complains, was actually a petition within the scope of section 72 of the Civil Practice Act (Ill. Rev. Stat. 1971, ch. 110, par. 72) and that the trial court erred in not treating it as such.

■■ The petition was not a section 72 petition and it was not intended to be. It specifically stated that it sought relief under section 187a of the Probate Act. There was no explanation for the lack of diligence in filing the petition—and in truth, there could not be. If her surrender of the passbook and the impending citation proceeding did not alert Mrs. Fitzpatrick that she might be divested of the account, the death of Mrs. Trahey in June 1971 was notice that she had been. An inquiry about the account at the Drovers Bank would have brought the response that it had been closed pursuant to the court order of March 4, 1971. The failure to allege and prove diligence is fatal to a section 72 petition; such

a petition is not designed to excuse a petitioner's own carelessness or mistake. *Filosa v. Pecora* (1974), 18 Ill.App.3d 123, 309 N.E.2d 356.

Moreover, the point concerning the possibility that the petition was within the scope of section 72 was raised for the first time in Mrs. Fitzpatrick's reply brief. Points not argued in an appellant's principal brief are waived and cannot be raised in the reply brief, in oral argument or in a petition for rehearing. Ill. Rev. Stat. 1971, ch. 110A, par. 341(e) (7).

At the hearing on the petition most of the testimony concerned Mrs. Trahey's mental condition. Her brother testified that when she was in the hospital in July 1970 she talked strangely and imagined seeing a woman in her room who was not there. She talked about some men taking her to the basement. She tried to walk down a stairway at the hospital and had to be confined in bed. When she returned home she accused their housekeeper of stealing. She sat in a chair near a window and would ask about a little nun she imagined seeing outside in the rain, where there was no nun and no rain. She remarked every night about the beautiful lights she saw, when the only visible lights were those of automobiles. She frequently got up during the night and on occasion had to be restrained from going outside in her nightgown. Her nephew, a friend of hers and the husband of her niece all testified as to her lack of competency. They related incidents which tended to show the deterioration of her mind in the last few years of her life, and precipitately so after her hospitalization in July 1970, such as losing her train of thought during conversations, her nonrecognition of relatives and her confusion as to their relationship, her imagining seeing people on the street outside her home or on the steps of a nearby church when there were no such people there at all.

Three friends of Mrs. Trahey testified for the petitioner. One said that Mrs. Trahey's physical condition—except for her lost eyesight—and her mental condition were the same in the final months of her life as they had been before. Another, who had not seen her between her eye operation and her death, but who had talked to her over the phone about once a week, testified that she conversed without rambling and her mental condition seemed the same as it always had been. A third friend, who had seen her at the Fitzpatrick home several times after the operation, testified that her physical appearance was the same as it always had been, her vision was improving, and that during these visits which lasted from 1 in the afternoon until 8:30 or 9 in the evening, she talked intelligently, carried on conversations as well as anyone and was in excellent mental condition.

The conflicting testimony posed a credibility question for the trial

court which was resolved by its finding that the "evidence is clear and convincing that Josephine Trahey was mentally incompetent to terminate the bank account at Drovers National Bank identified as Account No. 270085—4, at the time of the alleged termination of the same, and further, was mentally incompetent to open a new account at Drovers National Bank in the name of Josephine Trahey and Margaret Fitzpatrick, which account is identified as Account No. 269117 at the time of the alleged opening of said account in December of 1970."

The petitioner complains that the court erred in evaluating the testimony and that its finding was against the manifest weight of the evidence; that the respondents failed to sustain the burden that was theirs of overcoming the legal presumption that Mrs. Trahey was sane; and that the evidence they did present about her old age, ill health, impaired eyesight and lapses of memory was not sufficient in either weight or quality to prove that she did not know what she was doing at the time she and the petitioner opened the joint account.

██ No witness testified as to Mrs. Trahey's mental condition on the exact day the account was opened. Therefore, whether she was capable of understanding the nature of the transaction had to be deduced from the testimony concerning her physical weaknesses and mental incapabilities before and after that day. (*Ergang v. Anderson* (1941), 378 Ill. 312, 38 N.E.2d 26.) The testimony produced by the respondents showed that her decline in both capacities was rapid and continuous. By accepting this testimony, as was its right, the trial court could reasonably infer that on the day of the transfer she lacked the mental capacity to comprehend the consequences of her act which took her entire assets from the protective co-ownership of her blood relatives—with whom she had no discord and who had not disturbed the account in the 10 years of its existence—and transferred them to a person to whom she was not related by consanguinity—a transfer which did not come to light until weeks later when money was needed to defray the medical expenses arising from her broken hip. Although Mrs. Trahey was not adjudicated an incompetent until February 24, 1971, and there is a legal presumption that she was competent prior to the adjudication, and while illness and impairment of mind due to old age do not necessarily indicate so great a deterioration of capacity that a person is unable to understand the nature and effect of his actions or to protect his own interests, the trial court's finding that Mrs. Trahey was unsound in mind and memory at the time the second account was opened on December 7, 1970, was not against the manifest weight of the evidence.

██ The petitioner stresses the presumption of a gift arising from Mrs. Trahey's execution of the joint tenancy agreement. In *Murgic v. Granite*

734

*City Trust & Savings Bank* (1964), 31 Ill.2d 587, 591, 202 N.E.2d 470, the court stated:

"We hold that an instrument creating a joint account under the statutes presumably speaks the whole truth; and, in order to go behind the terms of the agreement, the one claiming adversely thereto has the burden of establishing by clear and convincing evidence that a gift was not intended. This burden does not shift to the party claiming under the agreement."

No evidence was introduced about the circumstances relating to the Trahey-Fitzpatrick account except the card bearing their signatures which provided that it was a joint account payable upon death to the survivor. The petitioner argues that the presumption of donative intent created by the presentation of that card was not overcome. The presumption of donative intent is completely overcome if the donor was incompetent at the time of the alleged gift. This, in effect, was the decision of the trial judge who cited the *Murgic* case in his memorandum opinion. ■■ In finding that the evidence was clear and convincing that Mrs. Trahey was mentally incompetent to open the account in December 1970, the court could have taken into consideration, in addition to the testimony we have outlined, her signature on the account card. It is so illegible that a meaningful reproduction in this opinion is impossible. The signature, when contrasted to the one on the 1960 account card, is graphic evidence of her physical deterioration.

The judgment of the circuit court is affirmed.

Affirmed.

McGLOON, P. J., and McNAMARA, J., concur.